```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 22-cr-338-1
 4            Plaintiff,              .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   LESLIE GRAY,                     .  October 23, 2023
                                      .  3:12 p.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - -
 8

 9                 TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      KYLE MCWATERS, AUSA
                                 United States Attorney's Office
14                               601 D Street Northwest
                                 Washington, D.C. 20579
15

16   For the Defendant:         DENNIS O'BRIEN, JR., ESQ.
                                 O'Brien Law Firm, P.C.
17                               33 Bull Street
                                 Suite 540
18                               Savannah, Georgia 31401

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4    Action 22-338-1, United States of America versus Leslie Gray.

 5          If I can have counsel please approach the podium and state

 6    your names for the record, starting with the United States.

 7              MR. MCWATERS:  Kyle McWaters on behalf of the United

 8    States.  Good afternoon.

 9              THE COURT:  Good afternoon, Mr. McWaters.

10              MR. O'BRIEN:  Good afternoon, Your Honor.  Dennis

11    O'Brien for Leslie Gray, the defendant.

12              THE COURT:  All right.  Good afternoon, Mr. O'Brien,

13    Ms. Gray.

14              PROBATION OFFICER:  Good afternoon, Your Honor.

15    Sherry Baker representing the Probation Office.

16              THE COURT:  All right.  Thank you, Ms. Baker.

17          So we are here for sentencing.  I've reviewed the final

18    presentence report and recommendation.  I've also read the

19    parties' sentencing memoranda and reviewed the government's

20    video exhibits.

21          Are there any other documents or exhibits that I should

22    have reviewed?  Anything from the government?

23              MR. MCWATERS:  Nothing from the government, Your

24    Honor.

25              THE COURT:  Mr. O'Brien?
```

1              MR. O'BRIEN:  No, Your Honor.

2              THE COURT:  Okay.  All right.  Mr. McWaters, are there

3       any victims here today who seek to be heard?

4              MR. MCWATERS:  There are no victims in the case, Your

5       Honor.

6              THE COURT:  All right.  Ms. Gray, have you had a

7       chance to review the presentence report, the final presentence

8       report?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  All right.  And have you had adequate time

11      to talk to your attorney about it?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And a chance to correct any errors in the

14      report?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All right.  Mr. O'Brien, I take it you've

17      got no objections, either to the guideline calculation or

18      factual inaccuracies to the report?

19             MR. O'BRIEN:  No, Your Honor, no objections.

20             THE COURT:  All right.  And none from the government;

21      correct, Mr. McWaters?

22             MR. MCWATERS:  No objections, Your Honor.

23             THE COURT:  All right.  So under Rule 32(i) of the

24      Federal Rules of Criminal Procedure, I will adopt the

25      presentence report as my findings of fact.  The guidelines apply

1    here.  Although they are advisory, they're not binding on the

2    Court.  Nonetheless, the Court does have to apply them

3    accurately before determining the sentence in this case.

4        So starting with the guidelines and the calculations that

5    begin on page 7 and continue on to page 8, the parties agree

6    that the base offense level at 2J1.2(a) is a level 14; is that

7    correct?

8            MR. MCWATERS:  Yes, Your Honor.

9            MR. O'BRIEN:  Yes, Your Honor.

10           THE COURT:  And the parties also agree that the

11   enhancement for substantial interference with the administration

12   of justice applies, so a three-level adjustment upwards, as well

13   as a three-level adjustment downward for acceptance of

14   responsibility, resulting in a total offense level of 14;

15   correct?

16           MR. MCWATERS:  That's right, Your Honor.

17           MR. O'BRIEN:  Yes, Your Honor.

18           THE COURT:  All right.  So the Court has independently

19   calculated the guidelines and agrees with those guideline

20   calculations, as well as the defendant's criminal history

21   computation, which is 0.  And therefore, the guideline range at

22   offense level of 14 and no criminal history is 15 to 21 months;

23   correct?

24           MR. MCWATERS:  That's right, Your Honor.

25           MR. O'BRIEN:  Yes, Your Honor.

```
1              THE COURT:  All right.  So I will hear first from the

2    government, and then I'll hear from you, Mr. O'Brien, and then I

3    will give Ms. Gray an opportunity to address the Court, if she

4    would like.

5         Mr. McWaters, can I just ask you one question before we get

6    started?

7              MR. MCWATERS:  Of course.

8              THE COURT:  Why is it that all these defendants

9    weren't charged together?  So I've had Mr. Hallon, and I'm going

10   to have Ms. Isaacs in a separate case.  And then Judge Mehta had

11   the nephew.  Didn't they all sort of travel together and enter

12   the Capitol at roughly the same time?

13             MR. MCWATERS:  So I believe Your Honor does have -- or

14   you already sentenced Mr. Hallon.

15             THE COURT:  And then I have Isaacs, but not in the

16   same -- is it in the same case?

17             MR. MCWATERS:  So Leslie Gray and Tracy Isaacs are in

18   the same case.  They're both under --

19             THE COURT:  And Hallon as well?

20             MR. MCWATERS:  Hallon was just a misdemeanant.  So I

21   think that's why he was --

22             THE COURT:  Carved out?

23             MR. MCWATERS:  Well, not carved out.  I think they

24   were all complained together, so they were all charged together

25   at the complaint stage.
```

1        THE COURT:  But then there was an information for him?

2        MR. MCWATERS:  That's correct.

3        THE COURT:  What about the nephew?

4        MR. MCWATERS:  That's not my case, so I'm not as

5   familiar with that.  But I believe the reason was because he was

6   a part of the Oath Keepers' leadership trial.  So he was more

7   involved --

8        THE COURT:  Was he really?

9        MR. MCWATERS:  I think he was Oath Keepers 2, if my

10  memory serves.

11       THE COURT:  Interesting.  I didn't -- okay.

12       MR. MCWATERS:  I believe that's right.  Yeah, I think

13  it was the second Oath Keepers trial.

14       THE COURT:  And was he convicted of the obstruction?

15       MR. MCWATERS:  I believe we addressed that in our

16  sentencing memorandum.  Off the top of my head, I don't

17  remember.  I think he was, but --

18       THE COURT:  He was sentenced to home confinement.  As

19  I understand it, he's autistic.

20       MR. MCWATERS:  And probation.  I think that's right,

21  Your Honor.

22       THE COURT:  Sorry.  I didn't realize that he was a

23  part of the Oath Keepers trial.

24       MR. MCWATERS:  So they did all -- so the four of them

25  drove up together, but then Isaacs and Hallon, Tracy Isaacs and

1    Luis Hallon went into the Capitol together.  Leslie Gray went in

2    on the same side of the Capitol but apart from Ms. Isaacs and

3    Mr. Hallon.  And then William Isaacs was separate from them.

4    His conduct on the Capitol grounds was separate from these three

5    defendants.

6         THE COURT:  And I ask the question in part because, in

7    trying to compare these defendants, who in the government's view

8    was the leader, if anyone?

9         MR. MCWATERS:  I'm sorry.  Can you --

10        THE COURT:  Who in the government's view was the

11   leader, not for guideline purposes, but just of the four?

12   Clearly not Hallon.  Was it Isaacs and the nephew?

13        MR. MCWATERS:  I believe Tracy Isaacs is the one who

14   coordinated the trip up to D.C.  I don't know if I would call

15   her a leader, but she was the one who coordinated the trip up to

16   D.C. among the four of them.

17        THE COURT:  All right.  Are you handling that

18   sentencing as well?

19        MR. MCWATERS:  Ms. Isaacs?  I am, Your Honor.  It was

20   supposed to be next week, but I think her mother just passed

21   away.  So we're continuing that sentencing.

22        THE COURT:  But is it the government's view that she,

23   like her nephew, was a member of the Oath Keepers?

24        MR. MCWATERS:  I believe Tracy Isaacs has admitted to

25   being a member of the Oath Keepers.  Not to get too much into

her case here, but I believe that she was a member of the Oath Keepers. I think her membership lapsed. And then a few days or maybe a couple of weeks before January 6, she sent in another check and re-upped her membership.

THE COURT: So the nephew was a part of the Oath Keepers second prosecution because he was with, what, a large group of them who went in?

MR. MCWATERS: So again, I think generally what happened was Ms. Isaacs was a member of the Oath Keepers, was on like some chats, had heard that they were going to be working security for the "stop the steal" rally, and they were looking for volunteers. And so Tracy Isaacs forwarded that link to her nephew. So that's how he got involved with that. So he was involved in the security detail on January 6.

THE COURT: I see. All right. Sorry for that diversion. I just wanted to ground myself in their relative culpability here.

MR. MCWATERS: Your Honor, yeah, all four of them drove up together, but then their conduct does diverge on January 6. But then again, that is why William Isaacs was charged separately, because his conduct was with other individuals and was different.

And I'm looking at the government sentencing memorandum, footnote 4, page 10. We do talk about William Isaacs. He was found by a jury on March 20th -- he was convicted of obstruction

1    of official proceeding in violation of 18 U.S.C. 1512(k) and

2    1512(c)(2).

3                THE COURT:  Yeah, I just didn't understand that that

4    was a part of Oath Keepers' larger prosecution.  That's all.

5                MR. MCWATERS:  It was.  Yes, Your Honor.  Apologize if

6    we could have been more clear in the memorandum.

7                THE COURT:  That's all right.  I just wanted -- like I

8    said, I wanted to have a sense of who was who in the group.

9        Before I forget, the videos that you provided to the Court,

10   they're available to the public?

11               MR. MCWATERS:  Yes, yes, Your Honor.  A through L, I

12   think, were the government's exhibits.

13               THE COURT:  All right.  You may proceed.

14               MR. MCWATERS:  Yes, Your Honor.

15       So kind of along Your Honor's questions, the government

16   wants to proceed today by looking at why Gray's conduct is

17   different, not just from the people that she went with but also

18   from other defendants on January 6.

19       The first is the ferocity with which Gray expresses her

20   beliefs and her opinions on January 6 in terms of the statements

21   that she made and expressed it towards, in particular, law

22   enforcement officers; second, not just the ferocity but the

23   particular language that she used on January 6 the government

24   believes is important; third, the actions that she takes on

25   January 6; and then fourth and finally, the lack of remorse that

1    she has demonstrated to this point.

2        And then the government will briefly address some

3    mitigation factors.

4        So the first with regard to the ferocity, if Your Honor

5    watched the videos, you can tell, Ms. Gray is not someone who is

6    going there and just, you know, quietly chanting along with the

7    crowd.  She is in some instances leading.

8            THE COURT:  She stands out, yeah.

9            MR. MCWATERS:  She definitely stands out.  You can

10   hear her voice over the ruckus, particularly when you get into

11   the exhibits where she is on the East Portico of the Capitol.

12   It's a very loud area.  Granted, it is her phone.  But you can

13   still hear her voice over the alarms that are ringing, some of

14   the explosions that are happening, and the rest of the chants

15   that are going on.

16       And when you listen to the video and you listen to

17   Ms. Gray's voice, it's not someone who is half-heartedly

18   chanting or protesting.  It is someone who is full-throatedly

19   lending their support behind the idea that the election on

20   January 6 was stolen, that fraud occurred, and that in fact she

21   believed that Donald Trump should have been the president on

22   January 6 and that the certification should have been certifying

23   him as president, not Joe Biden.

24       So I think that is something that stands out about

25   Ms. Gray, is the ferocity with which you can hear in her voice

1  the positions that she's taking and the way that she yells at

2  law enforcement officers.

3      Speaking of law enforcement officers, it's not just the

4  ferocity that she has but also the language that she uses.  I'm

5  not just talking about the colorful profanity that she uses on

6  January 6, but also the labels that she calls officers.  She

7  calls them traitors multiple times.  I lost count watching the

8  video how many times she calls law enforcement officers traitors

9  on January 6 for doing their job, for protecting the Capitol

10  building.

11      She calls them communists.  She says that they are

12  protecting communists.  She asks if -- are you happy protecting

13  communists, are you happy that what you're doing is un-American.

14  She calls them un-American.

15      And she also belittles officers.  At one point -- it's a

16  little unclear exactly who she is talking about from her video,

17  but there's one point, I think it's in Exhibit B, around 1:10 in

18  the video, she talks about a smaller officer that approaches the

19  line and makes a comment to the effect of oh, look at this

20  little thing that they've sent in, I'm a wuss and even I can

21  take her, talking about how she could take that officer if

22  necessary.

23      So yeah, it's not just the language that she uses in terms

24  of the profanity, but the labels that she calls them and also

25  the belittling of officers on January 6 for doing their job, for

doing what they're supposed to be doing that day and protecting the Capitol. There's no respect for law enforcement. There's no respect for the political process that is going on inside the Capitol.

I think that a fair way to characterize Ms. Gray's attitude on January 6 is complete and total disrespect for the rule of law in general and specifically with regard to what the officers were doing, trying to do there.

Third, the actions that Ms. Gray takes on January 6 and in particular -- there's a lot of actions that she takes, obviously, but in particular, there are three that stand out, I think. The first one is her interactions on the east front captured in Exhibit A and Exhibit B before she gets up to the portico where she is -- in Exhibit A, it looks like she's directly involved in pushing the line of officers back.

Ms. Gray was charged with a 231. That is going to be dropped at the end of this hearing. But she was charged with that. I think we only brought one charge, but there are multiple times where she did interact with law enforcement officers and directly resisted or impeded their ability to handle the riot that was ongoing.

So yeah, the first one on the east front captured in Exhibit A, she yells, "This is our house, motherfuckers," as she is pushing the rack back into the officers and kind of moving the police line back, it looks like, several yards, if not

1    several dozen yards back on the east front.

2        Eventually, the rioters break that police line and make it

3    to the East Capitol Doors.  You can hear Ms. Gray talking about

4    how "we're taking the house back now.  Patriots are taking the

5    house back.  Stop the steal."  She says, "We elected Donald

6    Trump as our president.  We demand Donald Trump as our

7    president.  And we are about to breach Congress."

8        And then in Exhibit F, Ms. Gray is, I believe -- it sounds

9    like she's talking on the phone to her husband, although I'm not

10    entirely sure.  But she's talking to someone and says, "I might

11    be going to jail tonight.  Find someone who has money to bail me

12    out if I survive."

13        And then earlier in another video, she talks about all the

14    things that she -- all the people that she loves.  It sounds

15    like someone who is prepared to be violent to get what she

16    wants, which is the reinstatement of Donald Trump as president.

17        THE COURT:  Did I hear her correctly when she's in the

18    Capitol at one point she makes some reference like "I'm not sure

19    what we're doing here"?

20        MR. MCWATERS:  I think that she was probably a little

21    surprised that they got into the Capitol.  It's clear from

22    before the Capitol you can hear her and other rioters talking

23    about what -- they're trying to stop the steal, so clearly a

24    reference to the certification that's ongoing.  She specifically

25    mentions Congress, that "we're trying to breach Congress.  I'm

1    in the halls of Congress trying to breach Congress," and again

2    specific references to the fraudulent or what she believes was

3    the fraudulent election.

4        She does say something along the lines of "not sure what

5    we're doing here now that we're in" or words to that effect.  I

6    think she was surprised that she got into the building, to be

7    honest.  I don't think that's a reference to her not having the

8    intent.

9            THE COURT:  Intent to obstruct?

10           MR. MCWATERS:  Right.  I think she was just surprised

11   she was in the building.  But clearly, trying to get in the

12   building, the intent there was to try and obstruct the

13   certification.

14       Plus, when she gets in the building, she does say -- right

15   after she says that, she says, "I'm in the halls of Congress,

16   and we've taken it," clearly an acknowledgment that her and the

17   other rioters have taken control of the building, which would

18   obviously stop the work of Congress that day in certifying the

19   election.

20       And then in Exhibit H, this is the second interaction with

21   law enforcement officers.  In Exhibit H, Gray can be heard

22   yelling with other rioters.  One rioter yells, "You still think

23   Joe Biden won," and then another rioter starts talking about, I

24   think, the oath to the Constitution, and Ms. Gray picks up that

25   chant and says, "Foreign and domestic, foreign and domestic,

enemies of the United States, traitors," yelling in the

direction of Capitol Police officers who were there.

She then goes up to one of them trying to enter another

hallway.  You might remember this.  She tries to go into a

hallway.

THE COURT:  And where is that?

MR. MCWATERS:  I'm not exactly sure where in the

Capitol it is.  It looks to me like it's the House hallway, the

House-side hallway that leads down towards the middle of the

Capitol, like towards the Rotunda, but I'm not exactly sure

where that occurs.  It looks to me like that's that House

hallway.

THE COURT:  Okay.

MR. MCWATERS:  And then the officer says, "You can't

go in.  You're not going in."  She says, "I'm going in.  This is

our house, sir.  Step aside.  I'm going in.  Don't tell me I'm

not coming in."  And then she ends up physically pushing past

the officer.  You can see that in her video and then in the

still images of Capitol footage that the government provided in

its memorandum.  You can see that she physically pushes past the

officers.

So that would be the second interaction with law

enforcement where law enforcement is clearly telling her to stop

doing what she's doing, and again, complete and total disregard

for them trying to do their jobs.

1    And she says -- after she pushes past the officer, she

2    says, "Don't tell me I'm not coming in.  I'm coming in.  Damn

3    right I'm coming in."

4    And then after that, as she's exiting the Capitol, still on

5    the east side -- and this is on the House side of the Capitol.

6    As she's leaving, she runs into a few Metropolitan Police

7    officers who are escorting or, you know, shepherding people out

8    of the building, and she's walking, and then when this officer

9    interacts with her and tells her to keep moving, like leave the

10   building, she stops, and she says, you know, "I'm not leaving.

11   I'm not going anywhere.  This is our house."  The officer, said,

12   "You are leaving.  You are going.  Don't make me use this."  In

13   reference to his baton, she says, "You're not going to hit me

14   with a damn baton."  And the officer proceeds to physically

15   shove her out the door with the baton.

16   So that's the third interaction that Ms. Gray had with law

17   enforcement that day.

18   Again, she wouldn't leave on her own accord.  She had to

19   literally be forced out of the building by an MPD officer.  And

20   then as soon as the officer pushes her out of the door, in

21   Exhibit K, you can see that Ms. Gray has filmed another -- and

22   all of these videos, by the way, are Facebook live videos.

23   She's streaming this and filming this to her Facebook followers.

24             THE COURT:  Does she have a large number of followers?

25             MR. MCWATERS:  I don't know how many followers she

1    has, Your Honor.  I don't have that information.

2         So she's streaming this, and she is again pointing the

3    camera in the direction of the officers that just shoved her out

4    of the building.  She calls them domestic enemies of the United

5    States.  She calls them traitors.  And actually, in this video,

6    she starts yelling traitors, and you can hear other rioters in

7    the vicinity join in the chant with her, which is what I was

8    alluding to earlier.  She was actually a leader in the sense

9    where she joined in chants and had others join in the chants

10   that she started.

11        And then, Your Honor, the fourth thing the government would

12   just point you that distinguishes Ms. Gray from other rioters is

13   the lack of remorse that she has shown.  The first one is the

14   lack of remorse that she showed on January 6 as she was again

15   pushed out of the building by law enforcement officers.

16        She records another video on the steps outside the Capitol,

17   references the rioter Ashli Babbitt, and says that "she was the

18   first American patriot to die in this revolution that began in

19   earnest today.  We stormed the Capitol.  We will take our

20   country back from the communists.  American patriots stormed the

21   Capitol.  I am an American patriot.  I stormed the Capitol

22   today," clearly very proud of the actions that she took on that

23   day.  That's in the immediate aftermath.

24        And then I would point Your Honor, Your Honor might

25   remember that this change of plea was scheduled twice.  The

first one, Ms. Gray couldn't make it through the allocution because she couldn't admit that she intended to stop the certification.  We came back about a month later, and she was able to make it through.

But I think that points to the government's argument that she hasn't -- she still doesn't really show a lack of remorse. She still believes that she was justified in what she did.

And if you remember what she said that day, she said on the first change of plea, she was like, "Well, I was just there.  I just wanted my voice to be heard."

Again, if you listen to not only the words that she said but the way in which she said those words and the actions that she took, I just don't believe that that statement is credible. It's clear that she was there to stop the certification.  She knew what was going on.  She was in the building trying to stop it.  Her interactions with law enforcement officers are not the interactions that someone who is just there to have their voice heard -- you don't push past officers and physically move barriers because you're there to have your voice heard.  You're doing it because you're trying to accomplish something, and Ms. Gray was trying to accomplish the stop -- the cessation of the recording of the electoral vote count.

This is not someone who was a meek bystander or tourist on January 6.  She was a rabble rouser on January 6 and actively engaged in fighting with law enforcement officers.

1       The last thing I would address very briefly, Your Honor,

2  are any mitigation factors.  I think there's two main ones here.

3  The first one is the lack of criminal history and Ms. Gray's

4  age.  But actually, even though they might seem like mitigation

5  factors, the government would posit that those are actually

6  aggravating factors, and I will explain why.

7       The first one -- well, it goes to both of them, and it goes

8  to that Ms. Gray should have known better.  She had no criminal

9  history, and she clearly knows what's going on here.  And even

10  with her experience and her lack of criminal history, she still

11  does these things.  She still goes to the Capitol, pushes past

12  these officers.  And she should have known better.

13       So instead of this being her lack -- her lack of criminal

14  history being something that is a mitigating factor, I actually

15  do think that this is an aggravating factor, because it just

16  shows that she should have known better before she went there.

17       THE COURT:  How was she arrested here?  Did she

18  voluntarily surrender?

19       MR. MCWATERS:  I don't have that information, Your

20  Honor.  I inherited this case from a previous AUSA after the

21  charges were filed.  So I'm not sure.  I believe she was

22  arrested, but I can't speak --

23       THE COURT:  Do you know if she was debriefed or

24  cooperated with the FBI at all?

25       MR. MCWATERS:  I do not think Ms. Gray gave a

1    statement.  Tracy Isaacs did give a statement to the FBI, her

2    co-defendant, but I don't have any information that she gave a

3    statement to the FBI.

4         THE COURT:  Okay.  And you don't have any information

5    about the extent of her following or her known ties to Oath

6    Keepers?

7         MR. MCWATERS:  So when it comes to Oath Keepers -- I

8    don't know how many followers she has.  It's my understanding

9    based on -- again, based on information that Tracy Isaacs

10   provided to the FBI, that Ms. Gray was interested in joining the

11   Oath Keepers, but that she -- I think she had submitted an

12   application to join the Oath Keepers, but it had not been

13   approved.  I'm not entirely familiar with their internal

14   approval process.  But I believe that prior to January 6

15   Ms. Gray had submitted an application to the Oath Keepers.  So

16   she wanted to join, but that had not come through.

17        There are chats that we found on Tracy Isaacs's phone where

18   Tracy Isaacs is referring to Ms. Gray, saying that I have a

19   friend, I think she actually says Leslie Gray, because she

20   provides her e-mail, which is -- I won't give it out here, but

21   she gives her e-mail to this other individual on this Oath

22   Keepers chat saying like can you check, my friend has submitted

23   an application, here's her e-mail address, here's her

24   information.

25        I think from what Tracy Isaacs said, they were trying to

 1   get VIP access to the "stop the steal" rally, which I think is

 2   another motivating factor for Ms. Isaacs.  But that's again --

 3           THE COURT:  Any evidence they were planning to try to

 4   breach the Capitol before January 6?

 5           MR. MCWATERS:  I don't have any particular evidence

 6   that prior to January 6 Ms. Gray was trying to breach the

 7   Capitol or had thought about breaching the Capitol.

 8           THE COURT:  Okay.

 9           MR. MCWATERS:  With that, Your Honor, unless you have

10   any other questions, I do believe that the government -- this

11   evidence that has been presented on Ms. Gray's actions on

12   January 6 fully supports the government's recommended sentence

13   of 18 months' imprisonment.

14           THE COURT:  All right.  Thank you, Mr. McWaters.

15           MR. MCWATERS:  Thank you.

16           THE COURT:  Mr. O'Brien.

17           MR. O'BRIEN:  Good afternoon, Your Honor.

18           THE COURT:  Good afternoon.

19           MR. O'BRIEN:  I'm sure it's not any -- I don't even

20   have to ask the Court to take judicial notice, but these cases,

21   I'm sure, have all been different than your normal criminal

22   case.  At the end of the day, it's what it is; it's a criminal

23   case.

24       Before I get into the heart of my argument, there are a few

25   things I do wish to address that the government did bring up and

1    the Court actually.

2         In speaking to my client regarding her Facebook followers,

3    she was not a social media influencer.  She may have had a

4    couple hundred friends on Facebook, but it was not -- she didn't

5    have her own -- a large social media footprint at all.

6         And the government was correct that she did file an

7    application to the Oath Keepers, but that was in belief that

8    they would be able to get seated closer to the former

9    president's speech.  That was her main reason to do that.

10             THE COURT:  So what was her motivation in the

11   live-streaming?  Is it --

12             MR. O'BRIEN:  To kind of document --

13             THE COURT:  Is it to communicate with her followers?

14             MR. O'BRIEN:  Just to preserve a record, and a record

15   has been preserved.  She was just live-streaming it.

16             THE COURT:  Was she under the influence of anything?

17             MR. O'BRIEN:  No, Your Honor.

18             THE COURT:  She's completely over the top, most

19   aggressive, loudest.

20             MR. O'BRIEN:  And that's very much out of character --

21             THE COURT:  Which is not consistent with what I've

22   seen in the courtroom.  So I'm wondering what was going

23   through --

24             MR. O'BRIEN:  The best I can explain to it, Your

25   Honor, caught up in the moment, crowd psychology.  I mean, it --

1    the government --

2              THE COURT:  That's a long moment, though, with a lot

3    of interactions with law enforcement.  It's not a moment.

4              MR. O'BRIEN:  No, it's -- and I don't mean for this to

5    sound trite, but I don't want to say getting caught up in a

6    football game, but you get crowds worked up.  You see it a lot

7    in England with soccer hooliganism.

8              THE COURT:  These are officers.

9              MR. O'BRIEN:  Oh, I understand, Your Honor.  And the

10   language she used was abhorrent.  And now, as a former police

11   officer in Memphis, Tennessee, for seven years, I got called all

12   sorts of things.  I wasn't called a communist, but Nazi, you

13   name the slur.

14             THE COURT:  Traitor?

15             MR. O'BRIEN:  Oh, no, I was called very vial names and

16   accused of doing very vial acts just to get a reaction.  I've

17   had objects thrown at me, hurled at me.  I've been -- tried to

18   have been run over, bottles, bricks thrown at me, shot at, spit

19   on.  And I don't want to say -- and I'm not justifying it.  That

20   does -- one runs a risk of that when putting on the badge, and I

21   knew that going in.  I'm not trying to say -- offend the Court

22   or anyone in any way, but getting called names, ugly names is a

23   daily occurrence.

24             THE COURT:  I know.  But she clearly did more than

25   call names.

1       So let me ask you, did she voluntarily surrender?  The

2   arrest date says June 15, 2022.  That's a long time after

3   January 6.

4         MR. O'BRIEN:  No, she did not.  The FBI executed a

5   dawn raid on her house, approximately 6:00 in the morning.

6         THE COURT:  In June of 2022?

7         MR. O'BRIEN:  Yes, Your Honor.

8         THE COURT:  Why didn't she come forward before then?

9         MR. O'BRIEN:  She did, Your Honor.  The FBI contacted

10   her.  She contacted me.  She stated she wanted to speak to a

11   lawyer.  I spoke with the FBI agent and said let me speak to

12   the -- whoever is prosecuting this case.  And I received a call.

13   I cannot recall his specific name --

14         THE COURT:  When did you reach out?

15         MR. O'BRIEN:  Oh, as soon as she called me.  This

16   would have been in spring of 2021.

17         THE COURT:  Okay.  But it took her a little while?

18         MR. O'BRIEN:  Well, as soon as she was contacted by

19   the FBI, she contacted me, Your Honor.

20         THE COURT:  Okay.  That's what I'm getting at.  She

21   didn't come forward.  She responded to law enforcement coming

22   after her.

23         MR. O'BRIEN:  Yes.  And she wanted to sit down and

24   talk.  And I asked for a proffer letter, like I would do with

25   any defendant.  I was told, and I can pretty much quote this

one, "That's not how this works here.  She talks.  If we like
it, then she can get a letter."

I might have gotten a little ruffled at that.  I told the
individual that he has me mistaken for a Kool-Aid drinker, I'm a
criminal defense lawyer, it's what I do, and I'm not going to
commit malpractice and have my client give a statement.

It was indicated that they had film and video.  I knew they
had film and video because I knew she had live streamed it.
There wasn't anything that they didn't know.

And so we agreed to disagree on, you know, speaking.  And
then the last thing I said, and I believe I said this to the FBI
agent, too, "I don't believe my client has any sort of criminal
record.  If there's any type of warrant, let us know.  She will
voluntarily surrender."  There is no need to get the FBI kitted
out like SEAL Team Six and do a dawn raid and shoot a King
Charles spaniel, because executing those raids are dangerous.
So she wasn't trying to dodge anything.

THE COURT:  But she also wasn't trying to come forward
and cooperate?

MR. O'BRIEN:  She was willing to speak.  I just as her
lawyer --

THE COURT:  Proactively.  She reacted to law
enforcement coming to her.  She didn't walk in and say "I want
to resolve this."

MR. O'BRIEN:  No, Your Honor.  This is kind of a first

1    for her.  She's not used to the criminal justice system.  I

2    think I can make a good argument that she was kind of scared and

3    not really sure what to do.

4        All of us in the courtroom here, we deal with this on a

5    daily basis in our professional lives.  And then when this

6    becomes a real action, it's very easy for us to fall back

7    knowing what we know and what we should do.

8        And that gets me to the plea that didn't take place.  I

9    think the question of the intent was what bothered Ms. Gray on

10   it.  At the time that she went into the Capitol, she most

11   certainly had the intent to go in there.  There's no doubting

12   that.  I think what Ms. Gray was confused about was did she come

13   up here with that intent.  No.

14           THE COURT:  I'm not hung up on that.

15           MR. O'BRIEN:  This is an intimidating courtroom to

16   somebody.

17           THE COURT:  No, I can appreciate what happened at the

18   plea.

19       What about when she gets tear-gassed out front and then

20   continues to fight to get in and eventually goes in?  Tell me

21   about that.

22           MR. O'BRIEN:  That's where -- that right there was the

23   obstruction of Congress, and we have discussed that, and that's

24   where -- that's where she messed up, amongst others.  There's no

25   arguing around that, and she knows that.  That's why we didn't

1    take this to trial.

2            THE COURT:  Okay.  I've read what you've written about

3    her background, both in your sentencing memorandum and in the

4    PSR.  What else would you like to bring to my attention?

5            MR. O'BRIEN:  Well, since the sentencing -- strike

6    that.

7            THE COURT:  The plea.

8            MR. O'BRIEN:  Since the Rule 11, her sister died last

9    week, last Monday of cancer.  That was Denise.  And I believe

10   that's Tracy's mother?

11           THE DEFENDANT:  No, that's separate.

12           MR. O'BRIEN:  So Denise died last Monday, and her

13   sister --

14           THE COURT:  This is her sister?

15           MR. O'BRIEN:  Denise is her sister.  Cindy Ingram is

16   another sister who is 62.  She's currently in a nursing home

17   with cancer.

18      And let me make sure I have the name right.  Shelly Watson

19   is the guardian and handles all the finances and everything like

20   that, but she is due to go under for brain surgery because

21   apparently there's some sort of arterial problem within the

22   brain.  I don't know if it's a clot, an aneurism, or something.

23      Then her husband, Don, could not make it up.  He was up

24   here the prior two.  He already has a bad heart, but the drives

25   up back and forth have aggravated his back.

1        That's what's been going on with Leslie on the personal

2    front.

3            THE COURT:  Okay.  I'm sorry to hear all that.

4        In terms of the need for any sort of treatment of any kind,

5    no need?

6            MR. O'BRIEN:  For Don?

7            THE COURT:  No, mental health, alcohol, anything.

8    This is such an extreme reaction, it does make one wonder what

9    sort of reactivity she's dealing with that might benefit from at

10   least counseling.

11           MR. O'BRIEN:  Well, I think the -- and I'm not one to

12   like blame it on the times, but everybody had been hyped up.

13   Lockdown due to COVID.  Then there were all kinds of riots,

14   courthouses burning, police stations burning, et cetera,

15   et cetera.  And then sudden changes in election systems did --

16   it inflamed people's passions, and people -- the whole country

17   at the time seemed to be able to have their passions inflamed

18   rather easily, not just Leslie but, you know, everyone that

19   appeared there.  Earlier in the summer, Andrew Jackson's statue

20   tried to get pulled down.  I mean, I won't say summer of '68,

21   but it was pretty -- lots of things were going on.

22       I'm puzzled by it, too, on -- especially knowing Leslie,

23   how things got to where they are.  And I know on my sentencing

24   memo, I didn't throw a lot of law in there.  I kind of generally

25   channeled my inner Joni Mitchell and just emoted.

1    But I do think the Court does have some tools in its tool

2    box to both -- it can vary downward, but I think it can also

3    maybe depart, especially if we were some time into next week, I

4    think past November 1st, because she does have zero criminal

5    history points.  And we're not talking just within this 15-year

6    look-back period but --

7         THE COURT:  I don't understand.  What do you mean

8    especially if it were some time into next week?

9         MR. O'BRIEN:  She will be a criminal history category

10   of 0 with zero criminal history points, Your Honor, and I think

11   that's kind of key really.

12        THE COURT:  So let me -- that is a factor.  Your memo

13   doesn't really address comparable defendants, and the government

14   highlights two cases.  I don't think you've listed any, have

15   you?

16        MR. O'BRIEN:  No, Your Honor, because --

17        THE COURT:  I am -- I'm careful to try to treat

18   similarly situated defendants similarly, particularly in these

19   cases.  The government gives me two cases where 15 months'

20   imprisonment was imposed.  I do have the discretion to impose

21   something other than a guideline sentence here.  And I've done a

22   search myself to identify other arguably analogous cases.

23        But are there any that you can direct the Court's attention

24   to that you think that I should be considering as I do this?

25   Because --

1          MR. O'BRIEN:  The one that stood out was one the

2     government mentioned, the 60 months with autism.  My client is,

3     as the PSI says, is in horrible health.

4          THE COURT:  I don't think that that's -- I don't know

5     the degree of autism, but I can imagine a defendant who presents

6     a certain way in court, a concern about safety and reading

7     queues and -- I can see that being a mitigating factor in a way

8     that -- not to minimize her health problems or her family

9     problems, but --

10          MR. O'BRIEN:  And the role she has to provide for her

11     family.

12          THE COURT:  I know.  But, Mr. O'Brien, you're familiar

13     enough, practically every defendant who stands before me has a

14     tough background and oftentimes a tough home situation where

15     people are counting on them.

16          MR. O'BRIEN:  Here's something I think I can point to

17     for someone engaged in a riot and a rioter.  This was a first

18     for me on watching any kind of video evidence, but when Leslie

19     got into the building, she prayed.  She didn't hit anybody.  She

20     didn't take spray paint to things.  She wasn't tossing Molotov

21     cocktails.  Yes --

22          THE COURT:  Had she done that, she would be looking at

23     a big enhancement.

24          MR. O'BRIEN:  Oh, I know, Your Honor, but that's --

25     it's very strange to see a rioter not destroying anything.

1    That's kind of part and parcel.  Something gets taken --

2          THE COURT:  The vast majority of the cases I have

3    didn't destroy anything.  Now, a lot of those were charged with

4    misdemeanors.  I've had someone go to trial, like Ms. Gray, who

5    literally walked through and didn't say anything nasty to anyone

6    and didn't get in any police officer's face, and that -- there

7    was evidence of intent to obstruct ahead of time, and that

8    defendant was sentenced to 15 months.

9      So different situation, didn't plead guilty and did testify

10   on the stand in a way that wasn't consistent with the evidence.

11   So it can be distinguished from that.  But I'm just saying,

12   she's not alone.

13         MR. O'BRIEN:  No, she's not.

14         THE COURT:  She's definitely not, and like I said,

15   I've looked at some other cases in addition to the ones the

16   government cited that I'll run by you.  But this is serious

17   conduct on a very critical day where officers were, as you well

18   know from your experience, doing all they could do to defend the

19   people in that building.  And you can say there's a lot of

20   people doing it, a mob mentality, but you can't ignore the

21   reality for those officers.

22         MR. O'BRIEN:  No, and I don't mean to do that.  And

23   saying the mob mentality, I'm not trying to use that as an

24   excuse.  That's really the only explanation.  It is so far out

25   of Leslie's character.

1              THE COURT:  And the taping, there's something with

2     that.  She's not a journalist.  She doesn't need to be taping.

3     But there's something.

4          Is she amped up because she's trying to present in a

5     certain way for her followers?  And who are these followers?

6     Why is she active on social media?  What is she getting from

7     that?  Is she getting advertisements?  What is that about?

8          It's a very odd thing for a middle-aged woman to be on

9     Facebook live-streaming a riot.  I mean, is this somebody who is

10    trying to join a group and trying to get more violent in her

11    approach?

12             MR. O'BRIEN:  She came here to hear Donald Trump

13    speak.  She legitimately thought the election was stolen.  She

14    came up here to protest it.  She had no intention when she came

15    up here to storm Congress, you know, her words.  That was not

16    what she was planning to do when she got in the car, you know,

17    in St. Cloud, Florida, to get on the interstate and go north.

18         But then on January 6th, out there in the crowd, something

19    happened.  And it's -- I cannot put a logical explanation -- I

20    mean, the Court's seen the videos.  You hear the bullhorns

21    coming in at different angles from your speakers.  Somebody was

22    hyping.  The crowd was getting hyped.  Leslie chanted.  She was

23    speaking loudly.  When you hear the volume, because naturally

24    she would be, she's speaking into her own microphone.  So her

25    voice is going to be prominent.

1          THE COURT:  But it's very vitriolic and angry.

2          MR. O'BRIEN:  Yes, it is, Your Honor, and it is out of

3    character, and I don't think that this is something we have to

4    worry about Leslie ever doing again.

5          THE COURT:  Fair enough.  It's not specific

6    deterrence.  There's a general deterrence.  There's a punishment

7    factor.

8          MR. O'BRIEN:  And it's -- in this case, she did want

9    to surrender if anything came out, and that didn't happen.  We

10   made the offer.  It was chosen not to.

11      The process, in some ways, is the punishment.  She's always

12   going to be a convicted felon going forward.  She turns 58 in

13   about a week.

14         THE DEFENDANT:  Four days.

15         MR. O'BRIEN:  Four days, she turns 58.  Most people in

16   their 50s, when they get arrested for the very first time, even

17   money it's going to be something like a DUI or something.

18         THE COURT:  There's a lot of these folks in this

19   January 6.  It's unfortunate.

20         MR. O'BRIEN:  There is, Your Honor, and they've been

21   arrested.  She's going to be a convicted felon.

22      I know the government argued that her age and lack of

23   criminal history is an aggravating factor.  I don't think it is.

24   I think this was just a -- one-off doesn't even justify it.

25   It's not something that she normally does.  She was caught up,

1    and I think with the amount of arrests that happened, you know,

2    the way that her case makes the news, Florida woman arrested,

3    et cetera, you know, her name got dragged out there.

4        She helps raise her 15-year-old granddaughter.  Her

5    granddaughter is ashamed by it, says don't bring any of this up,

6    I don't want my friends to know.

7        There's a genuine shame.  And it's not like the government

8    would paint it out to be, it's because she got caught.  No, it's

9    because of what she did, her actions.  There's genuine shame and

10   remorse.

11       And I think that would be a reason to vary downward.  It's

12   not going to happen.  She did try to cooperate.  It just --

13   various reasons, it did not occur.  She was willing to.  We

14   reached out.  We were ignored.  The warrants were executed a

15   year or so later.

16           THE COURT:  All right.  Well, if the Court were to

17   impose a period of incarceration, in order to accommodate the

18   health problems of the family, would you ask for -- obviously,

19   voluntary surrender, but would any period of time help her with

20   that?

21           MR. O'BRIEN:  Certainly, I would like to vary downward

22   from what Probation recommended.  30 to 60 days would be --

23           THE COURT:  Mr. O'Brien, we're on different

24   wavelengths.

25           MR. O'BRIEN:  Okay, six months.

1        THE COURT:  But what I'm asking is, given the

2    immediate health concerns and family needs, is there a period of

3    time which --

4        MR. O'BRIEN:  I would say 60 to 90 days, Your Honor.

5        THE COURT:  No, I don't mean length of time.  I mean

6    delaying reporting.

7        MR. O'BRIEN:  That's what I'm --

8        THE COURT:  60 to 90 days?

9        MR. O'BRIEN:  Yes, Your Honor.

10        THE COURT:  And I'm sorry if that's what you were

11    referring to before.  I thought you were talking about --

12        MR. O'BRIEN:  Not the first time, Your Honor.  The

13    second time, yes, I knew what you --

14        THE COURT:  Understood.  Let me just note for the

15    record, there are a number of instances in which judges in sort

16    of similar situations have imposed 18-month sentences, and

17    there's some others where they've imposed eight or nine months.

18    And then, of course, there's always the year and year and a day,

19    which is effectively ten months.

20        MR. O'BRIEN:  So the BOP is calculating it at 85

21    percent or 65 percent?  I wasn't sure on this one.

22        THE COURT:  I think it's 85 for good time credit,

23    yeah.  I don't know if there are other --

24        MR. O'BRIEN:  I didn't know if they were treating it

25    like some of my drug people who get 65.

1          THE COURT:  All right.  Let me just -- I'm going to

2     throw these cases out there, because -- to the extent either of

3     you have anything to add.

4          The government has already mentioned two cases, and that

5     is -- those are U.S. v. Andrew Hernandez, 21-cr-445.  In this

6     case, a defendant, a 45-year-old former Marine who was in the

7     Capitol for a shorter period of time and didn't live stream the

8     participation in the riot but had gone in some sensitive spaces,

9     was sentenced to 15 months' imprisonment.

10          U.S. v. Christine Priola, which is 22-cr-242, in that case,

11     Priola, unlike Gray, encouraged another person she was with to

12     come inside the Capitol building.  She also deleted electronic

13     evidence.  She was sentenced to 15 months.

14          In addition to those cases, in U.S. v. Andrew Hernandez,

15     21-cr-445, another defendant pled guilty of violating 1512,

16     faced the same guideline range, 15 to 21 months, was inside the

17     Capitol for a similar period, 11 minutes, was 45 years old,

18     yelled inflammatory statements like treason.  No other violence,

19     just yelling, did, however, enter the Senate Gallery, was a

20     former Marine, left the scene without police force.  That

21     defendant was sentenced to 18 months.

22          If you want to sit -- you're welcome to stand up, or if

23     you -- I don't want to leave you standing there if this is -- if

24     you expect to have things you want to say in response to this,

25     I'm happy to hear them, but your choice.  You don't have to

1    stand the whole time.

2        I'm just interested, to the extent you or the government

3    has points about these cases that I'm about to share that you

4    would like to emphasize, I want to hear them.  Because of

5    course, the records are not necessarily complete for someone

6    like me who is reading a transcript and can't be present for the

7    entire -- I haven't reviewed -- I've reviewed what the judge

8    said for the basis for the reasons, but I haven't in all cases

9    gone through the whole transcripts.  And some of these I don't

10   have transcripts for.

11       So in addition to those, of course, we've got U.S. v.

12   Michetti, M-i-c-h-e-t-t-i, 21-cr-232.  This is a case in which

13   Judge Cooper sentenced a defendant to nine months'

14   incarceration, 24 months' supervised release.  That defendant

15   also shouted inflammatory statements at officers inside the

16   Capitol.  That defendant didn't use violence.  That defendant

17   didn't, so far as the Court can tell, come to the Capitol with a

18   plan or as a part of a broader conspiracy.  Unlike Ms. Gray,

19   however, that defendant did have prior arrests and no health

20   issues.

21       U.S. v. Stottlemyer, S-t-o-t-t-l-e-m-y-e-r, 21-cr-334, in

22   this case, Judge Kelly sentenced a defendant to eight months'

23   home detention, as well as 24 months of supervised release.

24   That defendant had no inflammatory social media posts prior to

25   the riot.  That defendant did not agitate the crowd on the day

of the riot, did not act violently, had no criminal history, was

dealing with the death of an infant child in the lead-up to

January 6.

U.S. v. Hodgkins, 21-cr-188, a Judge Moss case, Judge Moss

sentenced the defendant to eight months' incarceration, 24

months of supervised release.  In that case, the defendant

shouted no inflammatory statements, stood in the Senate Chamber,

was one of the first to plead guilty, provided a full

confession, engaged in no violent behavior, walked around from

the Capitol, traveled from Florida, had no criminal history.

Those are the primary cases.  I don't know -- Mr. O'Brien,

do you have anything to add about the specifics of those cases?

MR. O'BRIEN:  No, Your Honor.

THE COURT:  Okay.  Does the government?

MR. MCWATERS:  Well, Your Honor, with regard to

Hernandez, I think there are two Hernandezes, because the second

one you referenced is the one the government included in its

sentencing memorandum, the 18-month incarceration.

THE COURT:  Sorry about that.

MR. MCWATERS:  I think they were brothers that were

sentenced, if I remember correctly.

THE COURT:  I see.

MR. MCWATERS:  I forget what the other one's first

name was.  But Andrew Hernandez is the one that the government

referenced in its sentencing memorandum.

1        THE COURT:  Okay.  So in addition -- okay.  And Pruitt

2   is the other -- no, not Pruitt, Priola was the other case you

3   referenced?

4        MR. MCWATERS:  Yes, Your Honor.

5        THE COURT:  The other case I would mention is one of

6   my own, and I mentioned it earlier in this hearing.  It's

7   U.S. v. Calhoun, 21-cr-116.  In that case, I sentenced a

8   gentleman in his -- about Ms. Gray's age who was a criminal

9   defense attorney from Georgia with no prior record who was

10  convicted of the 1512 and other charges as well, went to trial.

11  He had -- he was sentenced to 18 months, and he did take the

12  stand, and the Court didn't find all of his testimony entirely

13  truthful.  But he just walked through the building that day, and

14  he had some posts in advance of January 6 that showed a clear

15  knowledge of the vote and timing of the vote and all of that.

16      So in light of all these cases, does either side have any

17  further argument you would like to make?

18      MR. MCWATERS:  Just briefly, if I could address Hodges

19  and Calhoun briefly, Your Honor, if that's all right.

20      THE COURT:  Okay.

21      MR. MCWATERS:  Your Honor, I'm not -- obviously, those

22  weren't my cases, but I have some familiarity with Calhoun and a

23  little bit with Hodges.

24      It looks to me that Hodges didn't have any kind of --

25  actually, just from what Your Honor said, it sounds like most of

1    the individuals that you referenced had no violent interactions.

2         And while Ms. Gray's conduct is -- you could say whether or

3    not it was violent, certainly, she had like physical

4    interactions and altercations with police officers, which is why

5    she was charged with the 231.

6         It looks like in Calhoun and in Hodges there was no 231

7    conduct, no other felonious conduct.  Here, Ms. Gray

8    participated in otherwise felonious conduct, which I do think is

9    a distinguishing factor here.

10        THE COURT:  And I didn't mean to suggest -- I was

11   meaning kind of assault, you know, physical assault.  I know

12   assault can be a threat as well, but you know what I'm saying.

13        In Hodgkins, though, reviewing Judge Moss's transcript in

14   that case, apparently, there were times at which that defendant

15   attempted to exert a calming influence for those who were

16   engaged in the mayhem.  And he had taken significant steps

17   towards his rehabilitation.  I don't know what that was.  But he

18   pled guilty exceptionally early in the process.  So that informs

19   that sentence.

20        MR. MCWATERS:  Yes, Your Honor.  I think you hit on it

21   right there, the early acceptance and then also, you know,

22   working on issues and calming other rioters.  Obviously, the --

23        THE COURT:  The opposite here, right.

24        MR. MCWATERS:  You've seen all the videos.  There's no

25   such thing, and in fact continues to raise the temperature, if

1    you will.

2        And then with Calhoun, that is a little different.  That

3    one went to trial.  He did obstruct on the stand.  So it is a

4    little bit different.  And again, he had otherwise unfelonious

5    conduct.  The only thing there -- not the only thing, but the

6    intent evidence, which is obviously --

7        THE COURT:  He had the civil disorder.  I think he

8    did.

9        MR. MCWATERS:  That might be true, but I don't recall

10   seeing that in the file, but it's possible that he did.

11       But here, you know, like I said, Ms. Gray had otherwise

12   felonious conduct.  If we didn't have the 1512 intent evidence,

13   she would have a felony or we would have charged a felony in

14   addition to that.

15       Again, the government would still point to Hernandez and

16   Priola as the two cases that are the most accurate benchmarks

17   here, the 18 months and the 15 months.  And we think the cases

18   that Your Honor supports or put forward are distinguishable, and

19   the government still would say that 18 months is the correct

20   recommendation here.

21       THE COURT:  Okay.  Thank you.

22       All right.  Mr. O'Brien, so -- go ahead.

23       MR. O'BRIEN:  Just briefly on the Calhoun case, I know

24   you said there was no violence or he was just walking through.

25       THE COURT:  He said some outrageous things in -- on

1    social media.

2            MR. O'BRIEN:  Okay.  And was I correct in writing down

3    that he received 18 months?

4            THE COURT:  18 or 15.  18 months.

5            MR. O'BRIEN:  The one thing I would say is I would

6    expect a -- not just any lawyer, but a defense lawyer to be

7    judged harsher and held to a higher standard for one's conduct

8    in that case.  I don't think --

9            THE COURT:  Yeah, I get your point.  To like ground

10   you where I am, I'm considering a variance.  I'm not considering

11   a variance to the degree you're recommending.

12           MR. O'BRIEN:  Okay.  I was trying to tie in the new

13   sentencing guidelines and --

14           THE COURT:  I hadn't thought of that.

15           MR. O'BRIEN:  I was thinking of like home confinement.

16           THE COURT:  Well, the only case that I'm seeing in

17   this mix of cases with home detention was this -- I think the

18   Stottlemyer case.

19           MR. MCWATERS:  Your Honor, based upon what I'm looking

20   at, it looks like it was a split.  It was some incarceration and

21   some home detention.

22           THE COURT:  That's right.  I'm sorry.  Eight months'

23   incarceration, eight months' home detention.

24           MR. MCWATERS:  That's correct, Your Honor.  So it was

25   split.

1        THE COURT:  So in that case, how -- so I guess --

2   Judge Kelly, I guess that's not a zone C level at 14.  Zone C is

3   where you can do the split sentence.  So I guess Kelly varied on

4   the zones.

5        MR. O'BRIEN:  That's where my departure argument was

6   going to come into play.  And I believe if there is zero

7   criminal history points -- does it say going forward, if there's

8   zero criminal history points you don't have to be in zone C?  I

9   saw something on the Sentencing Commission's website, an

10  informational bulletin they threw out.

11       MR. MCWATERS:  Your Honor, I believe they take effect

12  on November 1st.

13       THE COURT:  I know.  I am contemplating a variance.

14    What are they going to say on November 1st?

15       MR. MCWATERS:  On November 1st?  I think the

16  government's position is that in these -- and I'm familiarizing

17  myself with that.  I was going to familiarize myself with it for

18  the Tracy Isaacs, because that was after November 1st.  I do

19  think that the government is going to object to the application

20  of the new rule.

21       THE COURT:  I know.  But by analogy, do you know what

22  it is so I can --

23       MR. MCWATERS:  Oh, I think it reduces them by a

24  certain amount.  I don't know off the top of my head what it is.

25       THE COURT:  My law clerk says you can drop two points,

```
 1    which would bring her to a 12, which is 10 to 16 months.

 2              MR. MCWATERS:  Which I think would still be in zone D.

 3              THE COURT:  No, zone C.

 4         All right.  Well, I want to hear from Ms. Gray, if she

 5    wants to hear from me -- I mean talk to me.  It's a long day.

 6              THE DEFENDANT:  Hello, Your Honor.

 7              THE COURT:  Good afternoon.  Ms. Gray, if I can have

 8    you be sure to speak into the microphone.

 9              THE DEFENDANT:  Yes, Your Honor.

10              THE COURT:  And take your time.  I know this is

11    difficult.

12              THE DEFENDANT:  On January 6, I ruined my life.  I

13    came to Washington with the intent to protest peacefully.

14    Unfortunately, I allowed myself to get caught up in the rioting.

15    I cannot explain it.  I was angry.  I can't explain how I

16    allowed myself to get caught up, but I did.  I take full

17    responsibility for my own actions.  I behaved on January 6 in

18    ways that does not describe who I am or ever have been.  I'm

19    deeply ashamed.  I've always been a law-abiding citizen.  I

20    respect law and order.  I respect police officers.  I always

21    have.  I'm very ashamed in how I behaved.

22         I should never have said the things I did.  I should never

23    have entered that building.  I can only explain it away with

24    adrenalin.  And once it was all done and the adrenalin wore

25    down, I just wished the day had never happened.
```

1          I learned something about myself since January 6.  I

2     learned that I should never ever allow myself to be put in a --

3     put myself in a crowd of people with any potential of anger or

4     rioting or anything, because clearly I allowed myself to get

5     caught up.  So I learned that I can never ever allow anything

6     like that to happen again.

7          My own actions, I can't blame anybody for what I did.  I am

8     a grown adult.  The prosecutor said that he saw that as my age.

9     Yes, I should have known better.

10          I have to live the rest of my life as a felon.  No matter

11     what sentence you impose on me today, I am a felon for the rest

12     of my life.  I have shamed my family.  I have ruined my good

13     name.  I have ruined my husband's good name, and my husband

14     doesn't deserve this.  My husband is a good, good man.

15          As my attorney told you earlier, I have to live with the

16     fact that my 15-year-old granddaughter has begged me to never

17     let her friends know what I did, because she's ashamed of it,

18     too.  And I help raise her.

19          It's difficult.  I accept responsibility for my actions,

20     and I'm ready to pay for my actions.

21          THE COURT:  Thank you, Ms. Gray.  I really do

22     appreciate your remarks.

23          Can you help me understand how you got roped in to this

24     day?  It's a long way to come from Florida.

25          THE DEFENDANT:  Okay.  Tracy contacted me.  Honestly,

we were just acquaintances at the time.  And she said, we're
going to Washington for the "stop the steal" rally, me and my
husband and my nephew.  I had never met her husband, and I had
never met her nephew.  And she said we're going, would you like
to come, I don't want to be the only female, I will pay the way.

I honestly would never have even come up had it not been
for that.  But that doesn't matter.  I still did.  I came.

I was angry.  I believed the election was stolen.  But the
behavior that I -- my behavior was just atrocious and
unacceptable.  Like I said, I will live with that for the rest
of my life, knowing that I've destroyed my family's good name,
knowing that I'm a felon.  When I came up here and I saw my name
on the outside of the door, the "United States of America
versus" and my name.  I love my country.  I love my nation.  I
valued my good name, and now I've thrown it away, and I've lost
it, and I'm forever a felon.

THE COURT:  What about your angry reaction?  Is that
something you struggle with more broadly?

THE DEFENDANT:  No.  I -- no.  I was angry over the
state of my country, over what I believed happened.

THE COURT:  So you were angry the whole way walking
from the "stop the steal" to the --

THE DEFENDANT:  No.  I didn't get angry until we were
out -- and I don't even know whatever side.  I had never been in
Washington before.  It was a first for me.  Whatever side it was

1  that we are on, all of a sudden, people came with bullhorns and

2  started screaming and yelling and riling up the crowd and saying

3  Pence had stabbed us in the back.  And the crowd just got angry,

4  and I got angry with the crowd.

5       Before that, it was just happy go lucky jolly.  We were all

6  just standing around talking; we were all just standing around

7  talking.  And then all of a sudden, a bullhorn here, and a

8  bullhorn there, and the crowds of people started erupting, and I

9  erupted with them.  I erupted with them.

10      I should have been -- I'm ashamed.  I heard you say that

11  whoever that one person was was the voice of calm and was the

12  voice of reason trying to calm people down.  That's usually me.

13  That's normally me.  I'm normally the voice of reason and the

14  voice of calm and the voice of peace.

15           THE COURT:  When you got out of the Capitol that day

16  after you were sort of pushed out with the baton, how long did

17  it take you to calm down?

18           THE DEFENDANT:  I was alone.  I couldn't find the

19  people I was with.  I wasn't calm.  I was frightened.  I was

20  scared.  I had to walk back to the hotel we were at.  My phone

21  died.  I couldn't find it.  Thankfully, I came across somebody

22  who helped me back to where I was.  It didn't take -- until I

23  got in that room and sat down until I was like -- please excuse

24  my words now -- what the hell just happened.

25           THE COURT:  Okay.  Thank you.

1          MR. O'BRIEN:  I don't think you need to hear anything
2     more from me.
3          THE COURT:  Well, I'm just -- let me share with you
4     what I was thinking coming into this, and my view of the case
5     hasn't changed a lot.
6          I will say on the record, I do clearly credit Ms. Gray's
7     expression of remorse.  I do believe it is genuine and she is
8     genuinely ashamed and that she had no intention to come to D.C.
9     to storm Congress.  So all of those, of course, are mitigating
10    factors, as is the various health needs all around her.
11         Coming in here, I was thinking about a year and a day is
12    about right, which would mean she would serve ten months
13    incarcerated.  The two-level drop, if the Court -- because I do
14    think some variance is appropriate, given her stellar criminal
15    record, even separate and apart from the potential guideline
16    amendment that's likely to pass.
17         So that was, in the Court's view, from a guideline range of
18    15 to 21 months a modest reduction from 15 to 12.  A year and a
19    day gives her a ten-month sentence, in effect.  In a matter of
20    days, the guidelines will change where her guideline range will
21    be ten to 16 months in prison.
22         That doesn't mean that the Court is inclined to go low end
23    of that and give her -- if the Court were to consider five and
24    five, it would be more like what Judge Kelly did in that case
25    where it was eight and eight, because that defendant is the one

1   who was the beacon of calmness and took all those steps.

2       I think treating these defendants similarly is important.

3   And she does have some mitigating factors, but so did that

4   defendant.

5       And I'm sure Judge Kelly was aware of this forthcoming

6   amendment coming.  It wasn't as close, but still, I'm sure

7   that's what guided his decision.  I don't have that transcript.

8       Regardless, if you're looking at eight months of

9   incarceration followed by eight months of home detention versus

10  a year and a day and serving ten months and being done, I don't

11  know.  If I were in her shoes, I might choose the year and the

12  day sentence.

13          MR. O'BRIEN:  May I have a brief --

14          THE COURT:  You may.

15          MR. O'BRIEN:  Thank you.

16      (Defense counsel and defendant conferred.)

17          MR. O'BRIEN:  Your Honor, after discussing that with

18  my client, including going over Bureau of Prisons math time

19  calculations --

20          THE COURT:  I'm sorry?

21          MR. O'BRIEN:  After going over the various time

22  calculations that would -- 12 months and a day would benefit,

23  the defense would be asking that it adopt U.S. Probation's

24  sentencing recommendation.

25          THE COURT:  Of a year and a day?

```
 1              MR. O'BRIEN:  Yes, Your Honor.

 2              THE COURT:  Okay.  All right.  Is there any reason why

 3    sentence should not be imposed at this time?  Would you like to

 4    be heard on what I just asked?

 5              MR. MCWATERS:  Yeah, if I can have a minute or two,

 6    Your Honor.

 7              THE COURT:  Of course.

 8              MR. MCWATERS:  The first thing, I guess, is with

 9    regard to the application of the new amendment to the

10    guidelines --

11              THE COURT:  I'm not applying it.  I'm not.

12              MR. MCWATERS:  Okay.  Then the second thing I would

13    say is yeah, if the Court is considering a downward variance,

14    again the government would still argue that the 18 months is the

15    appropriate recommendation.  However, I would say that keeping

16    Ms. Gray in zone D and with a period of incarceration as opposed

17    to a split sentence of incarceration and home confinement --

18              THE COURT:  That's what they just said they'd prefer.

19              MR. MCWATERS:  Yes, Your Honor.  I understand that.

20        The government's only position is that I also -- the

21    government is unsure of the idea of letting a defendant pick

22    their sentence.

23              THE COURT:  I was just curious.  They're not deciding

24    my sentence.  But it is -- I don't think, in light of the

25    Stottlemyer case, that I would ever consider going below that.
```

1     It wasn't a guarantee that I would do it if she wanted, but I
2     was interested in her perspective, because the last thing --
3     anyway, she's got a lot of family responsibilities, and I think
4     that it's a factor that's fair for the Court to consider.
5         She's not driving the sentence, but as I said, I came in
6     here thinking a year and a day is right, and that's where I'm
7     likely to land.
8         MR. MCWATERS:  Yes, Your Honor.  Again, I would just
9     say, the government would object to like the defendant being
10    able to pick their sentence.  I understand that you just said
11    that's not what you're doing.  I have to put it on the record.
12        THE COURT:  Are you saying, if I'm weighing these two
13    options, the government would prefer the eight and eight?  Is
14    that what you're saying?
15        MR. MCWATERS:  No, Your Honor.
16        THE COURT:  Because I would like to know that, too.
17        MR. MCWATERS:  The government's position would still
18    be that --
19        THE COURT:  Understood.  I'm rejecting the
20    government's position.  I am varying.  I think there are valid
21    grounds to vary in this case.  I think based on all the cases
22    I've read, I think this case falls very clearly between the 15
23    to 18 months and the other eight- and nine-month cases.
24        And I feel very comfortable with landing at a year and a
25    day, which she will serve unless she behaves well in prison and

1      she will serve ten months, and I think that's a sufficient but

2      not greater than necessary sentence.

3          If, however, the government -- since I asked the defense

4      the same, I'm happy to hear if you would prefer that I do that.

5      I might not follow it, but I'm interested.

6              MR. MCWATERS:  No, between those two options, Your

7      Honor, the 12 months and a day.

8              THE COURT:  All right.  Aside from that, any other

9      reason why sentence should not be imposed?

10             MR. MCWATERS:  No, Your Honor.

11             THE COURT:  Okay.  All right.  As I've noted, I'm

12     required to consider the various factors outlined in Title 18

13     United States Code Section 3553(a).  I've considered them all

14     here.

15         Starting first with the nature and circumstances of the

16     offense, this is a very serious offense in which Ms. Gray, along

17     with three other individuals with whom she traveled from

18     Florida, breached the east side of the U.S. Capitol on January 6

19     of 2021 -- you can have a seat if you want.  I appreciate it --

20     along with a crowd of hundreds.

21         At that time members of Congress had gathered to certify

22     the vote count of the Electoral College for the 2020

23     presidential election.  Ms. Gray and her accomplices were there

24     to obstruct the certification process and to stop President

25     Biden from being declared the President of the United States.

1    That day, Ms. Gray charged through police barricades on the
2    east side of the Capitol, went up the east stairs, and entered
3    the Capitol.  Throughout her advance on the Capitol grounds and
4    into the building, she repeatedly called officers names and
5    berated them for not letting the mob inside various parts of the
6    Capitol.  Near the east doors, she was present when tear gas was
7    used by the officers.

8    She entered very shortly after, just two minutes after the
9    Capitol doors were forced open by other rioters.  When Ms. Gray
10   entered the Capitol, she continued to yell at officers
11   throughout the building, repeatedly calling them traitors,
12   communists, and other derogatory names.  It's very easy to hear
13   her voice on the government's video exhibits because it's by far
14   the loudest and the most aggressive.

15   After Ms. Gray spent approximately between 10 and 15
16   minutes inside the Capitol, she refused to leave, despite
17   commands by an officer.  When she continued to ignore the
18   officer's commands, he shoved her towards the door with a baton.

19   She was not remorseful immediately afterwards.  She stated,
20   "We stormed the Capitol today.  The revolution in earnest
21   started today.  We will take back our country from communists.
22   American patriots stormed the Capitol today.  I am an American
23   patriot.  I stormed the Capitol today."

24   She has stated here today, later that day when she calmed
25   down in the hotel, she felt great remorse.  As I've said, I do

credit her remorse today.  The Court definitely would prefer to see a defendant like Ms. Gray come forward rather than wait for the FBI to contact her.

But there's still some mitigating characteristics that leads the Court to vary from the guidelines.  The Court has not applied the November 1, 2023, anticipated guideline change for no criminal history.  Nonetheless, as the Court said, in any case, the fact that she has no criminal history points, yes, it's taken into the -- by the guidelines, and yet, it's a mitigating factor, particularly when there's not even an arrest on her record.

According to the PSR, she doesn't have any mental or emotional problems, although the Court does encourage Ms. Gray to think honestly about whether her over-the-top anger reaction is something that she deals with more broadly in her life, and if so, pursue counseling.  I think that could be beneficial.

She has support of family and friends, including in her church.

She's experienced an extremely difficult childhood that is described in detail in the PSR.  The Court won't go through those details now.

She is -- has been -- I think a care-giver is too strong, but she has supported her 70-year-old husband who has heart defects, as well as her grandchildren, recently dealing with the death of her sister, another sister's illness.  All of these are

1    factors that make serving a sentence of imprisonment very

2    difficult, the Court appreciates, for Ms. Gray.

3         Nonetheless, considering all the cases the Court has

4    considered, including those cited by the government, as well as

5    those cited by the Court, the Court does believe that a sentence

6    below the guidelines, that a modest variance is appropriate in

7    this case.

8         Nonetheless, there's no question that a sentence of

9    imprisonment, in the Court's mind, is necessary here, and the

10   Court does believe that a sentence of ten months -- sorry, 12

11   months and a day, a year and a day, which could potentially be

12   in the end ten months if the defendant engages in good behavior

13   in prison, is sufficient but not greater than necessary to

14   fulfill the purposes of sentencing.

15        Considering the goals of deterrence, both specific and

16   general, as well as punishment, the Court believes that that is

17   the appropriate sentence, also considering the other purposes of

18   sentencing, including rehabilitation and incapacitation.

19        I will now read the formal sentence of the Court, and I

20   will give both sides a chance to object before I impose the

21   sentence that I will announce.

22        So pursuant to the Sentencing Reform Act of 1984 and in

23   consideration of the provisions of Title 18 United States Code

24   Section 3553, as well as the advisory sentencing guidelines, it

25   is the judgment of the Court that you, Leslie Gray, are hereby

1   committed to the custody of the Bureau of Prisons for a term of

2   12 months and one day on Count 3.  You're further sentenced to

3   serve a 12-month term of supervised release as to Count 3.

4        In addition, you are ordered to pay a special assessment of

5   $100 in accordance with Title 18 United States Code Section

6   3013.

7        While on supervision, you shall abide by the following

8   mandatory conditions, as well as the discretionary conditions

9   recommended by the Probation Office in Part D of the presentence

10  report.

11       And, Mr. O'Brien, have you reviewed those with Ms. Gray, or

12  do I need to read them here?  The discretionary conditions --

13            MR. O'BRIEN:  Yes, Your Honor.

14            THE COURT:  -- that were listed in the presentence

15  report, you have?

16            MR. O'BRIEN:  Yes, Your Honor.

17            THE COURT:  All right.  The mandatory conditions

18  include not committing another federal, state, or local crime,

19  not unlawfully possessing a controlled substance.  The mandatory

20  drug testing condition is suspended based on the Court's

21  determination that Ms. Gray poses a low risk of any substance

22  abuse.  There's no record of that.

23       You must cooperate in the collection of DNA as directed by

24  the probation officer.  You must make restitution consistent

25  with the plea agreement here, which is to the Architect of the

1    Capitol in the amount of $2,000.

2         And that is, I think, through the U.S. District Court; is

3    that right?

4              PROBATION OFFICER:  Yes, Your Honor.

5              THE COURT:  All right.  The Court determines you don't

6    have the ability to pay a fine and therefore waives a fine or

7    any interest on penalties that may accrue while on supervision.

8    The restitution obligation may commence within 30 days after the

9    release from imprisonment.

10         And it's important, Mr. Hopkins, that goes in the J&C,

11   given the recent issues with BOP.

12         So the Court will set the payment plan based on assessment

13   of the defendant's ability to pay at that time through

14   Probation.  The other financial obligations are immediately

15   payable to the Clerk of Court.

16         The Probation Office shall release the presentence

17   investigation report to the Probation Office in the home

18   district, which is the -- is that the Central District of

19   Florida?  All right.  The Court will transfer supervision of

20   this case to the home district.

21         But, Ms. Gray, I don't --

22              PROBATION OFFICER:  I'm sorry, Your Honor, Middle

23   District.

24              THE COURT:  Middle District of Florida.

25         Ms. Gray, in the unlikely event of a violation of

1   supervised release, which I don't expect, that would come to me

2   to handle, but the supervision will be done by the Middle

3   District of Florida.

4         Pursuant to the plea agreement and the relevant statutes,

5   you have the right to appeal the sentence imposed by the Court

6   if the period of imprisonment is longer than the statutory

7   maximum or the sentence departs upward from the applicable

8   sentencing guideline range.

9         If you choose to appeal, you must file any appeal within 14

10  days after the Court enters judgment.

11        As set forth in Title 28 United States Code Section 2255,

12  you also have the right to challenge the conviction entered or

13  the sentence imposed if new and currently unavailable

14  information becomes available to you or on a claim that you

15  received ineffective assistance of counsel in entering the plea

16  or in connection with the sentencing.

17        If you're unable to pay the cost of appeal, if you're

18  unable to afford it, you may request permission from the Court

19  to file an appeal without cost to you.

20        All right.  Is there any objection from the government to

21  the sentence as announced?

22              MR. MCWATERS:  No objection, Your Honor.

23              THE COURT:  All right.  Any objection from the

24  defense?

25              MR. O'BRIEN:  No, Your Honor.

1          THE COURT:  All right.  From Probation?

2          PROBATION OFFICER:  Good afternoon, Your Honor.  No

3    objection.

4      I just want to note on the record to notice to the

5    defendant that until she -- if the Court permits voluntary

6    surrender, that until she voluntarily surrenders, that she's

7    still under the conditions of pretrial supervision.

8          THE COURT:  All right.  Yes.  And I will allow

9    voluntarily surrender.

10     Is there -- I know we need to address the government's

11   motion.  Is there anything else?  Recommendation for BOP

12   facility?

13         MR. O'BRIEN:  Tallahassee, Your Honor.  That appears

14   to be the closest one.

15         THE COURT:  All right.  So I will recommend that.

16     Ms. Gray, that's just a recommendation.  I have no control

17   over where the Bureau of Prisons sends you, but I will make that

18   recommendation.

19     All right.  And there's a motion to dismiss the remaining

20   counts?

21         MR. MCWATERS:  Yes, Your Honor.  The government would

22   move to dismiss the remaining counts of the indictment as to

23   Ms. Gray.

24         THE COURT:  As to Ms. Gray, that motion is granted as

25   to Ms. Gray.

```
 1              COURTROOM DEPUTY:  I didn't hear any special --

 2              THE COURT:  Oh, special conditions of supervision?

 3    No.

 4              COURTROOM DEPUTY:  Thank you, Your Honor.

 5              THE COURT:  I don't think Probation had recommended

 6    any other than the payment of restitution that will be addressed

 7    upon release.

 8         All right.  I wish you the best, Ms. Gray.

 9         Thank you, all.

10         (Proceedings adjourned at 4:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8  /s/ Sara A. Wick_____          January 2, 2023_____

9  SIGNATURE OF COURT REPORTER        DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25